# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Owsley*, 2013 IL App (1st) 111975

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DONALD OWSLEY, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-11-1975 |
| Filed<br>Rehearing denied | September 10, 2013<br>October 23, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The evidence establishing that defendant engaged in deception to obtain control over the victim's property, including real estate and bank accounts while intending to permanently deprive the victim of the use, benefit, and possession of that property, and that he possessed with the intent to issue a quitclaim deed signed by the victim that was capable of defrauding another was sufficient to sustain defendant's convictions for the financial exploitation of an elderly person and one count of forgery, and the sentence of 3 years' probation and a $36,000 fine was not an abuse of discretion. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 05-CR-2330; the Hon. Timothy Joseph Joyce, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Jed Stone and Eric Shah, both of Stone & Associates, Ltd., of Waukegan, for appellant. |
|---|---|
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Yvette Loizon, and Rachel Mabbott, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE SIMON delivered the judgment of the court, with opinion. Presiding Justice Quinn and Justice Harris concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following a bench trial, defendant Donald Owsley was found guilty of five counts of financial exploitation of an elderly person and one count of forgery and sentenced to three years' probation and a $36,000 fine. On appeal, defendant contends that the State failed to prove him guilty beyond a reasonable doubt of financial exploitation of an elderly person or forgery and that the fine is excessive. For the reasons that follow, we affirm.

¶ 2    BACKGROUND

¶ 3    Defendant was charged with six counts of financial exploitation of an elderly person in that he stood in a position of trust and confidence with Theodore Hoellen and knowingly and by deception obtained control over the Theodore Hoellen Trust dated January 31, 2002, the parcel of land at 5845 North Kenton Avenue in Chicago, a certificate of deposit account from Liberty Bank, a savings account from Harris Bank, a certificate of deposit account from Banco Popular, and Hoellen's retirement plan benefits with the intent to permanently deprive Hoellen of the use, benefit, or possession of those properties. Defendant was also charged with forgery and eight counts of official misconduct for committing the crimes of financial exploitation of an elderly person and forgery in his official capacity as an employee of the Chicago police department and violating the rules and regulations of the Chicago police department.

¶ 4    At trial, John Hoellen, Theodore Hoellen's nephew, testified that Theodore was born on December 30, 1913, and lived by himself in a house at 5845 North Kenton Avenue. John lived in Chicago until 1995, when he moved to Washington, D.C., and thereafter visited Theodore every fall when he returned to Chicago for homecoming weekend at Northwestern University. John called Theodore to check in on him once a month, but was only able to get in touch with him six to eight times a year. John formed some concerns about Theodore's faculties during his visits in 1999, 2000, and 2001 because Theodore seemed increasingly confused.

¶ 5    Theodore first mentioned defendant to John during John's visit in 2002. Theodore, who seemed agitated, also spoke of some documents he had signed and John and Theodore searched for the documents, but could not find them. While John was visiting, defendant let himself inside Theodore's house with a set of keys, and he and John exchanged information. Theodore asked defendant where the documents he had signed were located, and defendant responded that he did not know. John returned to Chicago in December 2002 and encountered defendant when he arrived at Theodore's house. John asked defendant about the documents Theodore had mentioned during the previous visit, and defendant told John that he would have to ask Theodore about them. Theodore told John that he did not know what defendant was talking about. John subsequently contacted the Office of the Public Guardian, which provided him with a quitclaim deed for Theodore's property and a general power of attorney regarding Theodore.

¶ 6    John later returned to Chicago, and on February 10, 2003, he accompanied Theodore to Harris Bank, where they removed defendant as a beneficiary on Theodore's checking account and executed a revocation of power of attorney, a revocation of will, a revocation of trust, and a trustee deed. On February 11, 2003, John and Theodore went to Liberty Bank and closed an account under which defendant had been named as a beneficiary and opened a new account under Theodore's name. On February 19, 2003, John learned that an order of protection had been sought against him by Theodore. John returned to Chicago, and on February 28, 2003, the day on which he was to appear in court, John picked up Theodore, who did not know about the court date, and brought him to the hearing. As a result of the hearing, the court ordered an evaluation of Theodore, and on March 31, 2003, John learned that Theodore had been taken to the hospital. Theodore was subsequently transferred to a nursing home, and he died on July 12, 2006.

¶ 7    Peter Schmiegel, the deputy of the adult guardianship division of the office of the Cook County public guardian, testified that the division conducted an investigation of Theodore and determined that he was a disabled adult, that the public guardian was named as the guardian of Theodore's person and estate and filed a citation to recover assets against defendant on his behalf, and that Schmiegel deposed defendant and cross-examined him at trial as part of that proceeding. Schmiegel then testified regarding the testimony provided by defendant at the deposition and trial. Defendant testified that he first met Theodore in the fall of 1999 while responding to a call from Theodore's neighbor's house and that he visited Theodore with increasing regularity as they became friends. In early 2001, Theodore told defendant that he wanted to convey his house to defendant by a quitclaim deed and on February 10, 2001, defendant and Theodore executed a deed granting defendant a joint tenancy interest in Theodore's house in the presence of various witnesses. Defendant did not have the deed notarized or recorded until August 2003 because Theodore told him not to record it and to just hold on to it. On April 17, 2001, defendant and Theodore executed a document granting defendant a power of attorney for health care for Theodore and on May 25, 2001, they executed a document granting defendant a general power of attorney. Defendant and Theodore executed a will and trust on January 31, 2002, after having met with Warren Dulski, an attorney, because Theodore wanted defendant to be the recipient of his property. By the end of 2001, defendant, consistent with Theodore's wishes, had been placed

-3-

on all of Theodore's accounts at Liberty Bank, Harris Bank, and Banco Popular. Defendant sought an order of protection against John Hoellen after he was removed from the Harris Bank account on February 10, 2003, and filled out a petition for such an order, which Theodore then signed. Defendant further testified that on August 1, 2003, he had Alvero Guerrero, a notary public, notarize the quitclaim deed from February 10, 2001, and the accompanying statement by grantor and grantee, which was signed by defendant and Guerrero.

¶ 8        Patricia Walsh testified that she worked at a restaurant at which Theodore had eaten about twice a day. Walsh waited on Theodore almost every day. Beginning in 1998, she noticed that Theodore sometimes talked to himself or had conversations with people that did not exist and did not always change his clothes. Beginning in 2001, Walsh noticed that defendant joined Theodore for meals a couple times a week and that Theodore's demeanor was different when he was with defendant from when he was at the restaurant by himself because he sometimes seemed agitated when he was with defendant. Walsh also overheard defendant telling Theodore to sign some papers and saying "just sign the papers, what difference does it make?"

¶ 9        Sara Ausmann testified that she lived next door to Theodore until 2003 and that between 1995 and 1999, while she was in high school, she noticed that Theodore would walk up and down the streets and talk to himself and sometimes cuss at the trees and birds. In the summer of 1999, Ausmann found Theodore in her kitchen, and Theodore believed that she was an intruder in his house and took a swing at her. Ausmann called 911 while Theodore exited her house, and defendant and another police officer arrived a short time later. Ausmann told defendant what had happened, and he and the other officer went to Theodore's house. Defendant returned about a half hour later and told Ausmann that Theodore was likely confused and that the officers were going to take him to the hospital. A couple weeks later, defendant started visiting Theodore at his house a couple times a week, and after a few months, defendant would pick Theodore up and take him somewhere.

¶ 10        Warren Dulski testified that in the spring of 2001, defendant arrived at his office and said that he had a friend who needed help planning his estate, and that on July 28, 2001, he met with defendant and Theodore at his office. Defendant brought the deed to Theodore's house to the meeting, and Dulski prepared a will, a trust, and a quitclaim deed for defendant and Theodore. While Dulski's secretary prepared a deed in trust granting the house from Theodore to defendant, Dulski met with Theodore in private to go over the documents. Theodore declined to sign the documents, saying he needed time to think about it, and Dulski provided Theodore with a copy of those documents. In January 2002, Dulski received a phone call from defendant, who said that Theodore wanted to sign the documents at the end of the month but that he did not want to do it at Dulski's office because Dulski was Polish. Dulski allowed defendant to pick up the documents from his office, but told defendant that he would not assume any responsibility for them. Dulski explained that this was the only time he allowed such documents to be executed while he was not present and that he only allowed it to occur this one time because defendant was a police officer and seemed trustworthy. Defendant picked up the documents from Dulski's office a few days before January 31, 2002, and then returned them a few days later after they had been signed and

notarized. Dulski took the quitclaim deed to the recorder of deeds and had it recorded, then returned it to defendant. On cross-examination, Dulski stated that he did not doubt that Theodore understood the terms of the documents he had prepared and that the documents were consistent with what Theodore had said he wanted done.

¶ 11 Alma Ortiz, a bank manager at Harris Bank, testified that Theodore and John Hoellen came to her bank on February 10, 2003, and executed a revocation of power of attorney. Prior to doing so, Ortiz told them that she needed to speak with Theodore alone, but Theodore said that John could be present for any necessary discussions. Less than a week later, defendant came to the bank with Theodore and requested that his power of attorney be restored and handed Ortiz a document to that effect, and Ortiz responded that she could not accept that document at that time. Ortiz subsequently met with Theodore by himself and Theodore explained that he wanted to be the only person in control of his account. A few days later, Ortiz again met with defendant and Theodore, at which time they each spoke privately over the phone with a representative of the bank's account risk control department, and Ortiz did not make any changes to Theodore's account following that meeting. Ortiz also testified that the statements for Theodore's accounts showed that defendant became a beneficiary of his checking account in May 2001 and became a beneficiary of his savings account in October 2002. On cross-examination, Ortiz stated that if Theodore was not competent to change the beneficiaries on his accounts, he would not have been allowed to do so.

¶ 12 Chicago police officer Nancy Foley testified that on the morning of March 31, 2003, she responded to a home invasion call on the 5800 block of North Kenton Avenue and encountered Theodore and a neighbor of his when she arrived. Theodore seemed "confused and out of touch with reality" and stated that while he knew there were a few offenders, he could not see them because it was raining and snowing very heavily inside his house. There was no evidence that the house had been broken into, and Theodore was taken to a hospital. Defendant arrived at the scene while Officer Foley was present, and she testified that it was clear that Theodore knew defendant because he called him by his first name. On cross-examination, Officer Foley stated that defendant drove Theodore to the hospital in his car because Theodore did not want to be taken by an ambulance.

¶ 13 Dr. Robert Hanlon, a board-certified clinical neuropsychologist, testified that he evaluated Theodore on April 8, 2003, and concluded that Theodore suffered from a severe neuropsychological impairment and a moderate to severe functional disability and showed signs of mixed dementia consisting of features of Alzheimer's disease and vascular dementia. Dr. Hanlon opined to a reasonable degree of neuropsychological certainty that Theodore was well into the middle stages of Alzheimer's disease at the time of the examination and had been in the middle stages of dementia, and particularly Alzheimer's disease, for at least five years. Dr. Hanlon also opined that in the five years prior to the examination, Theodore was not capable of handling his finances or safely living independently.

¶ 14 Dr. Theodore Wright, a board-certified family practitioner, testified for the defense that he regularly treated Theodore beginning in February 2001 after defendant had arranged for an appointment and that defendant accompanied Theodore to the majority of his appointments. Dr. Wright did not observe any evidence of delirium or disorientation and

testified that Theodore seemed well-oriented and responsive. During an appointment on February 13, 2003, Dr. Wright suggested that Theodore be hospitalized for testing due to an irregularity in his heart rate, and Theodore responded that he did not want to be hospitalized and that if he did eventually need hospital care, he wanted defendant to be notified, but not John Hoellen. On cross-examination, Dr. Wright stated that he did not test Theodore regarding his orientation and that he did not disagree with Dr. Hanlon's opinion that Theodore was suffering from dementia at the time Dr. Wright was treating him.

¶ 15     Dr. Sanford Finkel, a board-certified geriatric psychiatrist, testified for the defense that he reviewed a number of documents regarding Theodore's condition and opined to a reasonable degree of psychiatric certainty that Theodore had sufficient capacity to execute his last will and testament, sign the powers of attorney, and assign a beneficial interest in his bank accounts. Dr. Finkel also opined that Dr. Hanlon's diagnosis that Theodore was suffering from the middle stages of Alzheimer's disease in April 2003 was not consistent with the records and the medical literature in the field. On cross-examination, Dr. Finkel stated that Theodore had developed a mild cognitive impairment in the early 2000s and developed early stage Alzheimer's disease by early 2003.

¶ 16     Jean Sullivan Gutrich, a funeral director and embalmer, testified for the defense that she met with Theodore and defendant in December 2001 to discuss Theodore's funeral arrangements. Gutrich also testified that Theodore did not seem confused during the appointment and that she did not have any concerns about his capacity to make his own arrangements at that time.

¶ 17     Based on this evidence, the trial court found defendant guilty of the counts of financial exploitation of an elderly person relating to the trust, the property on Kenton Avenue, and the accounts at Liberty Bank, Harris Bank, and Banco Popular. The court also found defendant guilty of forgery, but found him not guilty of all the other crimes of which he was charged. In doing so, the court determined that the State proved beyond a reasonable doubt that defendant obtained control over Theodore's property with the intent to permanently deprive him of the use, benefit, or possession of that property because the evidence showed that defendant obtained a beneficial interest in Theodore's bank accounts and trust and that defendant and Theodore executed a quitclaim deed conveying Theodore's house to defendant. The court also determined that defendant used deception to obtain control over Theodore's property because the evidence showed that defendant was not telling the truth when he told Theodore and John in fall 2002 that he did not know where the documents Theodore had signed were located; was not telling the truth when he told Dulski that Theodore did not want to sign the documents Dulski prepared at Dulski's office because he was Polish; concealed the quitclaim deed executed on February 10, 2001, granting him a joint tenancy in Theodore's house by failing to have it recorded or notarized until August 2003; and recorded that deed in August 2003 despite knowing that he did not have the authority to do so.

¶ 18     Following a sentencing hearing, the court entered an order sentencing defendant to concurrent terms of three years' probation and separate fines of $18,000 for financial exploitation of an elderly person and forgery. In reaching that sentence, the court noted that defendant did not ultimately receive any profits from the crimes, that Theodore did not suffer

any bodily harm as a result of defendant's actions, and that defendant's status as a police officer was not an aggravating factor. The court stated that it considered the long-term and well-planned nature of the offenses as an aggravating factor and the various letters in support of defendant as factors in mitigation. As to the fine, the court reviewed the information regarding defendant's income and found that he had the financial wherewithal to pay the total fine of $36,000 in monthly installments of $1,000.

¶ 19                                    ANALYSIS

¶ 20                          I. Sufficiency of the Evidence

¶ 21    Defendant contends that the State failed to prove him guilty beyond a reasonable doubt of financial exploitation of an elderly person or forgery. A defendant's challenge of the sufficiency of the evidence to sustain his conviction is reviewed to determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Jordan*, 218 Ill. 2d 255, 269-70 (2006). This standard recognizes the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences therefrom. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). This court will only reverse a conviction when the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *People v. Ross*, 229 Ill. 2d 255, 272 (2008).

¶ 22                 A. Financial exploitation of an elderly person

¶ 23    A person commits the crime of financial exploitation of an elderly person when he stands in a position of trust or confidence with the elderly person and he knowingly and by deception or intimidation obtains control over the property of the elderly person with the intent to permanently deprive the elderly person of the use, benefit, or possession of his property. 720 ILCS 5/16-1.3(a) (West 2000). The parties do not dispute that the State proved beyond a reasonable doubt that Theodore was an elderly person or that defendant stood in a position of trust and confidence in relation to him.

¶ 24                                  1. Deception

¶ 25    Defendant asserts that the State failed to sustain its burden because it did not prove that he engaged in any acts of deception or intimidation in regard to Theodore. The State responds that the evidence established that defendant used deception to obtain control over Theodore's property. Under the general definition of the term "deception" provided in the Criminal Code of 1961 (720 ILCS 5/15-4 (West 2000)), a person has engaged in deception if he has knowingly created or confirmed another's impression which is false and which the offender does not believe to be true or failed to correct a false impression which the offender has previously created or confirmed. Regarding the offense of financial exploitation of an elderly person, the term "deception" also refers to a misrepresentation or concealment of material fact relating to the terms of a contract or agreement entered into with an elderly person or the condition of a property involved in such a contract or agreement and the use

or employment of a misrepresentation, false pretense, or false promise to induce, encourage, or solicit an elderly person to enter into a contract or agreement. 720 ILCS 5/16-1.3(b)(4) (West 2000).

¶ 26    Viewed in the light most favorable to the State, the evidence shows that defendant did not tell the truth when he told John Hoellen in fall 2002 that he did not know where the documents Theodore had signed were located, as Schmiegel testified that defendant admitted that he was in possession of the February 10, 2001, quitclaim deed from that date until he had it recorded and notarized in August 2003 and Dulski testified that he returned the January 31, 2002, quitclaim deed to defendant after it had been recorded. The evidence also supports the inference that defendant did not tell the truth when he told Dulski that Theodore did not want to sign the documents prepared by Dulski in his office because Dulski was Polish, as Theodore likely would not have visited Dulski's office and allowed him to prepare those documents in the first place if he harbored such a prejudice. The evidence further shows that defendant concealed the existence of the February 10, 2001, quitclaim deed by failing to have it recorded or notarized until August 2003. As a rational trier of fact could have determined that defendant engaged in those deceptive acts in the furtherance of a plan to obtain control over Theodore's property, the State presented sufficient evidence to establish the element of deception.

¶ 27    In addition, the testimony of Ausmann, Walsh, and Dr. Hanlon, viewed in the light most favorable to the State, shows that Theodore suffered from a mental impairment and functional disability and was not capable of handling his finances during the time period at issue. The State also presented evidence showing that Theodore's mental vulnerability was readily apparent and that defendant knew of Theodore's condition from the time he met him, as he first met Theodore in response to Ausmann's call regarding Theodore's uninvited presence in her house. The evidence further shows that despite being aware of Theodore's condition, defendant convinced Theodore to execute various documents granting him a beneficial interest in Theodore's property. As such, a rational trier of fact could have determined that defendant engaged in deceptive acts in obtaining control over Theodore's property by holding Theodore out to be competent to transfer interests in that property despite knowing that he was not competent to do so.

¶ 28                                        2. Permanent deprivation

¶ 29    Defendant asserts that the State did not prove that he intended to permanently deprive Theodore of the use, benefit, or possession of his property because the evidence showed that he did not take any money from Theodore's bank accounts and that he would not have received any interest in Theodore's property until after Theodore had died. To prove a defendant guilty of financial exploitation of an elderly person, the State must establish that the defendant obtained control over the property of an elderly person "with the intent to permanently deprive the elderly person *** of the use, benefit, or possession of his or her property." 720 ILCS 5/16-1.3(a) (West 2000). In its finding of guilt, the court stated that the State had satisfied this element because the term "permanent deprivation" was defined, in part, as meaning to "[s]ell, give, pledge, or otherwise transfer any interest in the property or

-8-

subject it to the claim of a person other than the owner" (720 ILCS 5/15-3(d) (West 2000)) and the evidence showed that defendant transferred interests in Theodore's property to himself.

¶ 30    Initially, we agree with defendant that the evidence does not show that he intended to deprive Theodore of the use or possession of his property, temporarily or permanently, because defendant would not have gained possession of Theodore's properties until after he had died and there is no evidence showing that defendant interfered with Theodore's use of his properties in any way. As such, the issue in this case is whether defendant intended to permanently deprive Theodore of the benefit of his properties.

¶ 31    It is a fundamental maxim of property law that "the owner of a property interest may dispose of all or part of that interest as he sees fit." *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 167 (1998). While the absolute right to dispose of property as one sees fit may be tempered upon the owner's death by the statutory right of a surviving spouse (*In re Estate of Mocny*, 257 Ill. App. 3d 291, 295 (1993)), one of the benefits of property ownership is the largely unencumbered right to determine the manner in which that property will be disposed of upon one's death. In this case, the State presented evidence showing that defendant obtained control over interests in Theodore's properties that would have vested upon Theodore's death. As such, a rational trier of fact could have found that defendant intended to permanently deprive Theodore of a benefit of his properties by interfering with his right to determine the manner in which they would be disposed of upon his death.

¶ 32    While the parties discuss the issue of whether the State presented sufficient evidence to prove beyond a reasonable doubt that defendant obtained control over Theodore's property in the State's appellee's brief and defendant's reply brief, that issue was not raised by defendant in his appellant's brief and, as such, any claim to that effect has been forfeited. Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008). Moreover, a defendant "obtains control" over a property when he transfers an interest in that property to himself (720 ILCS 5/15-7, 15-8 (West 2000)), and the State presented evidence showing that defendant obtained control over Theodore's properties by engineering the transfer of beneficial interests in those properties to himself. Accordingly, we conclude that the State presented sufficient evidence to prove defendant guilty beyond a reasonable doubt of the offense of financial exploitation of an elderly person.

¶ 33                                    B. Forgery

¶ 34    A person commits the crime of forgery when, with intent to defraud, he issues or delivers any document apparently capable of defrauding another such that it purports to have been made by another or at another time, or with different provisions, or by authority of one who did not give such authority while knowing it has been made or altered for that purpose. 720 ILCS 5/17-3(a)(2) (West 2002). In this case, defendant was charged with having committed the offense of forgery in that he allegedly possessed with intent to issue a quitclaim deed signed by Theodore on February 10, 2001, that was capable of defrauding another because it purported to have been made by the authority of Theodore while defendant knew that it was not made by the authority of Theodore.

¶ 35    The record shows that on August 1, 2003, defendant signed the statement by grantor and grantee associated with the February 10, 2001, quitclaim deed and had that document notarized despite having learned earlier that year that his power of attorney for Theodore had been revoked. Defendant has not included in the appellate record the quitclaim deed and accompanying statement of grantor and grantee, which was admitted into evidence, and it is not clear from the report of trial proceedings whether defendant signed the statement merely as a grantee or also as an agent of the grantor. As defendant bears the burden of providing this court with a complete record sufficient to support his claims of error and any doubts arising from the incompleteness of the record will be resolved against him (*People v. Lopez*, 229 Ill. 2d 322, 344 (2008)), we will presume that defendant signed the statement both as a grantee and as an agent of the grantor, Theodore. As such, we conclude that a rational trier of fact could have found that defendant committed forgery when he recorded the February 10, 2001, quitclaim deed and statement by grantor and grantee in August 2003 despite knowing that the statement by grantor and grantee was made without the authority of Theodore and that the State presented sufficient evidence to prove defendant guilty of forgery beyond a reasonable doubt.

¶ 36                              II. Excessive Sentence

¶ 37    Defendant contends that the $36,000 fine imposed upon him is excessive and that this court should modify his sentence by reducing the size of the fine. Defendant does not dispute that the fine falls within the permissible statutory range, but asserts that it is excessive because he did not receive any money from Theodore or his estate and a punitive damages award of $50,000 had already been entered against him in a related civil case.

¶ 38    When the sentence imposed falls within the statutory range permissible for the offense of which the defendant is convicted, a reviewing court may disturb that sentence only if the trial court has abused its discretion. *People v. Jones*, 168 Ill. 2d 367, 373-74 (1995). A sentence will be deemed excessive and the result of an abuse of discretion if it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *People v. Stacey*, 193 Ill. 2d 203, 210 (2000).

¶ 39    It is the province of the trial court to balance factors in aggravation and mitigation and make a reasoned decision as to the appropriate punishment (*People v. Streit*, 142 Ill. 2d 13, 21 (1991)), and it is not our prerogative to reweigh these factors and independently decide that the sentence is excessive (*People v. Alexander*, 239 Ill. 2d 205, 214-15 (2010)). The record shows that the trial court considered proper aggravating and mitigating factors in sentencing defendant, as the court considered the well-planned nature of the offenses, defendant's lack of profit from the crimes, the lack of injury to Theodore, and the letters in support of defendant in deciding his sentence. Regarding the size of the fine, the court reviewed information regarding defendant's income and determined that defendant had the financial wherewithal to pay the $36,000 fine in $1,000 monthly installments. Under these circumstances, we conclude that the trial court did not abuse its discretion by imposing a total fine of $36,000.

¶ 40                              CONCLUSION

¶ 41        Accordingly, we affirm the judgment of the circuit court of Cook County.

¶ 42        Affirmed.